UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NANCY POWERS,

                  Petitioner,

    -vs-

ELAINE LORD, Superintendent, Bedford Hills
Correctional Facility,

                Respondent.
_____

**DECISION AND ORDER**
**No. 03-CV-0889(VEB)**

## INTRODUCTION

Represented by counsel, petitioner Nancy Powers ("Powers") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging her conviction in Erie County Court on charges of second degree murder (N.Y. Penal Law § 125.25(1)) and fourth degree criminal possession of a weapon (N.Y. Penal Law § 265.01(2)). The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the petition is dismissed.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Powers was arrested for, and convicted of, the murder of Jack Jarmack ("Jarmack"). Jarmack was the ex-husband of Kathy Phillips ("Phillips"), with whom Powers was in a romantic relationship at the time. He also was the father of three children with Phillips. Powers was the only witness to the events of December 15, 1997, the night on which Jarmack was killed in his home in East Aurora, outside the City of Buffalo.

Powers was tried before a jury in Erie County Court (Buscaglia, J.). At trial, the

prosecution presented the results of the autopsy, which indicated that Jarmack had been stabbed twenty-five times before he died, including seven wounds to the right front chest area, eight to the abdominal area, one to the groin, five to the back (three to the left back and two to the right back), one to the right scrotum, one to the left buttock, and one defensive wound to each arm. T.1588-90, 1591.[1] The proof indicated that Jarmack had been stabbed with several different knives. According to the medical examiner, many of the wounds, individually, would have been fatal: Jarmack's pulmonary artery, lungs, liver, and spleen had been damaged as a result of the stabbings. T.1607-09. He also had suffered a neck wound which had caused him to bleed into his oral cavity. The medical examiner found the broken-off tip of a knife blade in Jarmack's chest, embedded in his sternum. T.1584-85, 1598-1604. Furthermore, Jarmack sustained two wounds to his neck *after* he was dead, according to the medical examiner. Apparently, the wounds were bloodless; had Jarmack been alive when he had received them, the wounds would have bled. T.1592-94.

Powers testified in her own behalf at trial in support of a defense theory of justification. She testified that as she was walking to her parents' car in the parking lot of the Ames Plaza in East Aurora at about 9:15 p.m., someone put a sharp instrument to her neck as she was about to open the car door and said "Hey, Nance, get in the fucking car." T.1901. Powers stated that she immediately recognized the voice as Jarmack's.[2] According to Powers, Jarmack forced her to

---

[1]     Citations to "T.__" refer to the trial transcript.

[2]     Powers had her own car but had borrowed her parents' car that evening. In addition, Powers could not explain how Jarmack knew she would be at the plaza, or that she would be driving her parents' car. T.1906.

drive to his house.[3] Once there, according to Powers, Jarmack first shoved her into a bedroom and then into the living room, where he sat her down on the couch and began yelling at her, gesturing with a knife which he was resting against his knee. T.1908-10.

While they were arguing, Powers remembered that she had a can of pepper spray in her pocket.[4] T.1910. Powers sprayed Jarmack in the face; he became angry and slashed at her neck with a knife. Powers testified that she ran into the kitchen, picked up a knife off the counter, and stabbed Jarmack; she was not sure how many times she made contact. T.1911-12, 1915. Powers related that Jarmack chased her throughout the house and that at least twice, they had ended upon the floor with Jarmack on top of her. T.1914, 1918. Powers could not explain, however, how Jarmack had five stab wounds to his back. T.1985. Powers testified that Jarmack swung a bayonet knife at her but she blocked him by using her forearms.[5] T.1912-13.

Powers related that when she stabbed Jarmack in the chest, he fell to the ground. T.1919. At that point, Powers ran outside carrying a knife with her.[6] T.1920. Powers related that she got

---

[3] At first, Powers told the police that Jarmack sat next to her as she drove. T.1042. Later, after being told that a surveillance camera would be able to confirm whether Jarmack was in the car, Powers stated that Jarmack actually had been lying on the seat with his feet next to her. T.981, 1049-50. The defense offered no explanation as to how Jarmack had gotten to the plaza in the first place since his car was at his house. Jarmack's girlfriend testified that she had been talking to him on the phone that night on and off from about 8:00 p.m. until 9:14 p.m. T.477-86.

[4] Powers testified that she had purchased the pepper spray earlier that day for Phillips, and that she still had it in her pocket.

[5] Dr. Leary, who examined Powers at the emergency room, found that she had a wound on the left side of her neck, a wound on the left side of her anterior chest, and a wound to her left axilla (armpit). T.115. Dr. Leary described these wounds as "superficial" and stated that none of them was life-threatening. T.116. Powers' story to Dr. Leary was that she sustained the neck injury at the time that she was abducted in the parking lot; she said that the chest and axilla wounds occurred during her struggle with Jarmack at the house. T.118. Dr. Leary testified that individuals who have been stabbed, as Powers claimed to have been, typically have "defensive type wounds" on their forearms and hands. T.119. However, Powers had no bruises or defensive wounds to her hands or forearms. T.120, 1037.

[6] When she first talked to the police, Powers testified that she "forgot" to tell them that she had left Jarmack's house with a knife. T.1985. Later, she explained that she had taken the knife for protection because "every

into her parents' car and drove around aimlessly. She testified that she had gotten lost, ended up on Route 400, and then drove to her parents' home in Orchard Park via the Thruway and Route 219. T.1921-23. Powers said that eventually made it home to her parents' home about two hours after the time she said she had left Jarmack's house. Her parents called 911 at 11:43 p.m.; the police and paramedics came immediately. Powers testified that she bled heavily from her wounds and was afraid that she might die from them.[7] T.2002.

According to Officer Bucilli, the paramedic/EMT who was the first officer to see Powers at her parents' home, testified that her wounds looked "fresh," even though more than two hours had elapsed since the alleged struggle. T.729-30. Powers told him that Jarmack was at his house, if he was "still alive." T.731, 783.

Powers told Dr. Leary, the emergency room physician, that Jarmack had stabbed her in the neck while they were driving in the car, and that he had stabbed her twice more at his house. T.113-15.[8] Dr. Leary, testified that the cuts she exhibited on her left neck, left armpit, and left chest were "superficial" and "consistent with being self-inflicted." T.121-24.[9] Dr. Leary testified over defense objection that individuals who have been stabbed, as Powers claimed to have been, have wounds on their arms which "are usually considered defensive type wounds." T.119. In his

---

time [she] turned around," Jarmack had a knife. T.1920.

[7]    However, emergency personnel were not called until 11:43 p.m., about an hour and a half after Powers's encounter with Jarmack. In attempting to explain how she did not manage to bleed very much in the car, Powers testified that she held her side as she drove. T.2002. Powers related that even the paramedics had difficulty stopping the bleeding from her wounds. T.1925.

[8]    However, as noted above, Powers testified at trial that Jarmack did not stab her until *after* they had returned to Jarmack's house and she had pepper-sprayed him.

[9]    Defense expert Dr. Abbott testified on cross-examination that he had never seen a case of self-defense in which the victim had received twenty-seven stab wounds and the person claiming self-defense received only three superficial wounds. T.2038.

experience, defensive-type wounds usually occur on the forearm or on the hands because "when people are defending themselves they usually use their forearm and hands and those are the areas where they get cut." T.119-20. As noted above, Dr. Leary found no injuries at all on Powers' forearms or hands. T.120.

When the police found Jarmack, he was lying on the floor in the hallway in a prone position with a broken knife-blade to his left and a knife embedded in his chest. T.100, 1584. A military-issue bayonet and a shotgun were found near his body. T.265, 994. Jarmack was wearing a t-shirt, underwear, and nylon sweatpants. T.101.

Items recovered from the vehicle driven by Powers included a knife, a pair of plastic goggles, a store receipt for pepper spray, and a camouflage-patterned neoprene rubber sock insert. The sock appeared to match one that had been found in a gym back discovered alongside the Route 400 expressway in East Aurora on December 16, 1997. T.1707-08. The bag also contained a pair of white socks, blue Reebok pants, a pair of white long johns, a black t-shirt, a roll of grey duct tape, a bayonet sheath, hunting boots, and a BB gun. T.1224-29.[10] Testing revealed that the plastic goggles contained DNA consistent with Powers' DNA, and the defense expert conceded this. T.1317-18, 1353, 1802.

Upon examining the physical evidence, the police noticed that the bayonet sheath had the initials "JSP" carved into it. They contacted Powers' ex-husband, Jeffrey Powers, who was skeptical when he heard that his former spouse was a murder suspect. At first, he testified that he falsely diagramed how his initials appeared in an attempt to test the integrity of the police

---

[10]     Powers stated that she knew nothing about any of these items found in the car she was driving on the night of the murder. T.1941, 1943, 1977. Powers' mother, to whom the car belonged, testified that she had never seen the items before. T.573-74.

officers. T.607-09, 1392-95, 1409-10. After he spoke to the police, Jeffrey Powers received a phone call from his ex-wife. She told him what had happened that night and said that when she left Jarmack's house, he was alive but not moving. T.614-15. According to Jeffrey Powers, petitioner asked him not to testify.   When he told petitioner that he had identified the bayonet sheath as his and told the police he had given the bayonet to petitioner's brother, she became noticeably upset. T.616. Powers' father testified and confirmed the gift of the bayonet from Jeffrey Powers to petitioner's brother.

After her arrest, and prior to trial, Powers shared a cellblock in the Erie County Holding Center with Jeanette Tascarella ("Tascarella"). T.1456. Tascarella testified for the prosecution that Powers had related that she was involved with Phillips, Jarmack's ex-wife. T.1457. Powers said that Phillips wanted her to kill Jarmack because Jarmack was trying to take their children away.[11] T.1459. According to Tascarella, Powers recounted murdering Jarmack, saying that she had "shocked the shit out of him" but that Jarmack was struggling and did not want to die. T.1460. Powers told Tascarella that as Jarmack was bleeding to death, Powers said to him, "You'll never see your kids again." Powers also asked Tascarella to find someone who would kill her ex-husband, Jeffrey Powers, so that he would not be able to testify about the bayonet. T.1464.

The jury returned a verdict convicting Powers as charged in the indictment. She was sentenced to an indeterminate term of twenty-five years to life in prison.

Represented by new assigned counsel, Powers appealed her conviction to the Appellate Division, Fourth Department, of New York State Supreme Court, which unanimously affirmed

---

[11]       At the time of the murder, Jarmack had a pending court proceeding in which he was attempting to enforce an existing order of visitation.

the judgment. *People v. Powers*, 298 A.D.2d 938, 748 N.Y.S.2d 100 (App. Div. 4th Dept. 2002).

Leave to appeal to the New York Court of Appeals was denied. *People v. Powers*, 99 N.Y.2d

563, 784 N.E.2d 88, 754 N.Y.S.2d 215 (N.Y. 2002).

      After her direct appeal, it appears that Powers retained the Furman Law Firm/Prisoners

Constitutional Rights Project in New York City to represent her. On September 8, 2003,

represented by these attorneys, Powers began prosecuting a motion pursuant to New York's Not-

for-Profit Corporation Law § 1510(e) to have Jarmack's body disinterred and to have an autopsy

performed on it. Counsel also moved to vacate the judgment pursuant to New York Criminal

Procedure Law ("C.P.L.") § 440.10, arguing that trial counsel had been ineffective (1) in failing

to adequately investigate the possibility that blood testing and/or DNA testing of the knife

embedded in the victim's body might have helped the defense; (2) the prosecutor adduced

perjured testimony from a jailhouse informant (Tascarella); (3) trial counsel was ineffective in

failing to investigate and interview other witnesses who would have impeached that testimony;

(4) the Erie County District Attorney's practice of using confessions made by defendants to

informants/inmates confined at the Erie County Holding Center raised a constitutional due

process issue; and (5) trial counsel was ineffective in failing to request a jury instruction

informing the jury about the inherently suspect nature of informant testimony.

      On September 20, 2004, the trial court denied Powers' motion to vacate on procedural

grounds pursuant to C.P.L. § 440.10(2)(c) and on the merits. As to the ineffective assistance of

counsel claim regarding the failure to perform DNA testing, the trial court noted that, in denying

Powers' motion to disinter, it had "determined that the presence of the defendant's DNA inside

the [victim's] body would not have created a reasonable possibility of a different verdict."[12]

County Court Order Denying C.P.L. § 440.10 Motion at 2. The trial court found significant the

"expert testimony that the superficial wounds on the defendant's arms were self-inflicted and

inconsistent with defensive wounds." *Id.* The trial court held that the present motion was "devoid

of factual allegations" calling that ruling into question. *Id.*

As to the claims stemming from the prosecutor's alleged subornation of testimony from

the jailhouse informant, the trial court determined that Powers "failed to allege any facts

demonstrating that the witness [*i.e.*, Tascarella] in question testified falsely, much less that the

People knew the testimony was untrue." *Id.* at 3 (citation omitted). With respect to the contention

that defense counsel erred in investigating and finding witnesses to impeach the jailhouse

informant, the trial court found that Powers' assertion that there *were* other witnesses who could

have discredited Tascarella's testimony was "also pure speculation." *Id.*  The trial court rejected

as unpreserved Powers' claim that trial counsel should have requested a specific jury instruction,

finding that it could have been raised on direct appeal but unjustifiably was not.

In the meantime, while the C.P.L. § 440.10 motion was pending, Powers filed the instant

habeas corpus petition on or about November 25, 2003, through the same counsel who

represented her on the C.P.L. § 440.10 motion. *See* Petition (Docket No. 1). Powers sought and

was granted a stay of the petition while she was exhausting her state court remedies on the

ineffective assistance of trial counsel claims raised in support of the C.P.L. § 440.10 motion. On

December 17, 2004, after the denial of her C.P.L. § 440.10 motion, the Court (Siragusa, D.J.)

---

[12]    As discussed below, Powers reasons that if her DNA were present in the deceased's body or on the knife blade, it would prove that her version of self-defense is "correct and that the prosecution erred resulting in the conviction of an actually innocent defendant." *See* Petition (Docket No. 1).

granted Powers' motion to lift the stay.

Respondent answered the petition on February 4, 2005, characterizing the petition as raising two claims: (1) trial counsel was ineffective in failing to have DNA testing performed on the knife found embedded in the victim's body, and (2) trial counsel was ineffective in failing to request a jury instruction regarding the proper weight to be given the testimony offered by a jailhouse informant. Respondent interposed the affirmative defense of procedural default as to both of these claims. The Court has reviewed Powers's habeas petition and observes that it is an exact copy of the C.P.L. § 440.10 motion that Powers submitted to the state trial court. *See* Petition (Docket No. 1). The Court deems Powers's petition to contain the claims discussed by the trial court in its order denying C.P.L. § 440.10 relief and by respondent in its memorandum of law and will proceed to consider the alleged procedural default prior to discussing the merits of the petition.

## DISCUSSION

### Procedural Default

Respondent argues that Powers' ineffective assistance of trial counsel claims regarding the failure to perform DNA testing and the failure to request a jury instruction are procedurally defaulted because the trial court, in disposing of Powers' motion to vacate the judgment, relied upon a state procedural bar rule, C.P.L. § 440.10(2)(c).[13] Respondent contends that the trial

---

[13] "Notwithstanding the provisions of subdivision one, the court must deny a motion to vacate a judgment when: (c) Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him[.]" N.Y. Crim. Proc. Law § 440.10(2)(c).

court's decision rests on an "adequate and independent state ground," and therefore federal review of the claims is foreclosed.

Respondent is correct that a federal court may not review a federal question on habeas review if the state court's "decision rests upon adequate and independent state grounds." *Harris v. Reed*, 489 U.S. 255, 261 (1989) (citations and internal quotation marks omitted). "[A] procedural default does not bar consideration of a federal claim on habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Tankleff v. Senkowski*, 135 F.3d 235, 247 (2d Cir. 1998) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 (1991)); *see also Harris*, 489 U.S. at 264 n. 10 ("[A]s long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent state ground doctrine "curtails reconsideration of the federal issue on federal habeas."). The bar on habeas review resulting from a procedural default applies even where, as here, the state court issues an alternative holding addressing a procedurally defaulted claim on the merits. *See*, *e.g.*, *Harris*, 489 U.S. at 264 n. 10; *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) (*per curiam*).

However, a procedural bar forecloses federal habeas review only where it constitutes both an "independent" and "adequate" state law ground for deciding the claim. In the present case, it is clear from the state trial court's decision that the court was relying on an "independent" state procedural rule (*i.e.*, C.P.L. § 440.10(2)(c)) and not on any rule of federal law in denying the motion to vacate with respect to both claims. Thus, it only remains to be determined whether the rule relied upon is "adequate" to support the decision.

A procedural bar is "adequate" if it is based on a rule that is "'firmly established and

regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)

(quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). Whether application of the procedural

rule is "firmly established and regularly followed" must be judged in the context of "the specific

circumstances presented in the case[.]" *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003)

(citing *Lee v. Kemna*, 534 U.S. 362, 386-87 (2002)); *Hathorn v. Lovorn*, 457 U.S. 255, 263

(1982) ("State courts may not avoid deciding federal issues by invoking procedural rules that

they do not apply evenhandedly to all similar claims.").

### 1.      Failure to Investigate

The Court turns first to the "adequacy" of the trial court's invocation of C.P.L. §

440.10(2)(c) to deny the claims that trial counsel was ineffective in failing to investigate or

conduct DNA or blood testing on the knife found in Jarmack's body and in failing to investigate

or interview witnesses who would have impeached the testimony offered by the jailhouse

informant. The Court finds that the procedural grounds proffered by the trial court fail to satisfy

the adequacy standard given the circumstances presented in the instant case with respect to these

ineffective assistance claims. The Court notes that, under New York law, ineffective counsel

claims involving matters *outside* the record generally must be pursued by way of a C.P.L. §

440.10 motion. New York courts have held that some ineffective assistance claims are "not

demonstrable on the main record" and are more appropriate for collateral or post-conviction

attack, which can develop the necessary evidentiary record. *Sweet v. Bennett*, 353 F.3d 135, 140

(2d Cir. 2003) (citing *People v. Harris*, 109 A.D.2d 351, 360, 491 N.Y.S.2d 678, 687 (App. Div.

2d Dept. 1985) (collecting cases); *People v. Brown*, 45 N.Y.2d 852, 382 N.E.2d 1149, 410

N.Y.S.2d 287 (N.Y. 1978)); *People v. Mora*, 290 A.D.2d 373, 373-74, 737 N.Y.S.2d 71, 72

-11-

(App. Div. 1ˢᵗ Dept.) ("Defendant's claim that he was denied the effective assistance of counsel due to a purported conflict of interest is based on factual allegations *dehors* the record that would require a CPL 440.10 motion . . . ."), *appeal denied*, 98 N.Y.2d 639, 744 N.Y.S.2d 768 (N.Y. 2002); *People v. Brown*, 45 N.Y.2d 852, 853-54, 410 N.Y.S.2d 287, 287 (N.Y. 1978) ("Generally, the ineffectiveness of counsel is not demonstrable on the main record . . . [and] in the typical case it would be better . . . that an appellate attack on the effectiveness of counsel be . . . brought under CPL 440.10.").

Here, the ineffective assistance claims regarding trial counsel's failure to investigate were not based on matters within the trial record but rather focused on counsel's failure to perform certain evidentiary testing that purportedly would have yielded exculpatory results and failure to find witnesses to impeach a key prosecution witness.  Accordingly, it appears that the claims properly were the subject of a C.P.L. § 440.10 motion to vacate. *See People v. Joseph*, 266 A.D.2d 237, 238, 697 N.Y.S.2d 659, 659 (App. Div. 2d Dept. 1999) ( "The defendant contends that he was denied the effective assistance of counsel because of certain alleged conflicts of interest and counsel's alleged failure to gather exculpatory evidence. However, these claims concern matters *dehors* the record and thus are not reviewable on appeal . . . ."), *appeal denied*, 94 N.Y.2d 881, 705 N.Y.S.2d 13 (N.Y. 2000); *People v. Garcia* 187 A.D.2d 868, 590 N.Y.S.2d 565 (App. Div. 3d Dept. 1992) (where defense counsel allegedly failed to introduce into evidence physician's  report indicating that his examination of child victim did not reveal physical evidence of child abuse, defendant's claim of ineffective assistance was based upon matters *dehors* the record and was more properly the subject of a C.P.L. § 440.10 motion to vacate the conviction rather than a direct appeal); *People v. Boyd*, 244 A.D.2d 497, 664

N.Y.S.2d 335 (App. Div. 2d Dept. 1997) (holding that defendant's claim of ineffective assistance

of counsel, to extent that it was premised on his attorney's alleged failure to investigate and call

potential alibi witnesses, involved matters which were *dehors* the record and were not properly

presented on direct appeal); *Quinones v. Miller*, No. 01Civ.10752(WHP)(AJP), 2003 WL

21276429, at *21 (S.D.N.Y. June 3, 2003) ("Because the conflict of interest claim in this case is

based on evidence outside the trial record, Quinones had no choice but to bring his conflict claim

under C.P.L. § 440.10 rather than on direct appeal. His failure to raise the conflict claim on

direct appeal therefore cannot be considered an 'adequate' state ground barring this Court's

review on the merits.").  Based on these precedents, the Court finds that the procedural rule was

not "adequate" to preclude habeas review. The Court therefore will consider the merits of these

ineffective assistance claims.

### 2.        Failure to Request Jury Instruction

The Court next considers the alleged procedural default with respect to Powers' claim

that trial counsel was ineffective in failing to request a jury instruction regarding the weight to be

accorded Tascarella's testimony, who was a jailhouse informant. Here, the Court agrees with

respondent that C.P.L. § 440.10(2)(c) was an "adequate" state ground for dismissing the claim.

The alleged error that is the basis for Powers' ineffectiveness claim–trial counsel's failure to

request a particular jury instruction–obviously is contained within the trial record. The Court

cannot see any reason why appellate counsel would have needed an evidentiary hearing or other

information outside of the trial record in order to develop this claim. *See Sweet v. Bennett*, 353

F.3d at 140 ("However, the alleged error that is the basis for Sweet's ineffectiveness claim was

particularly well-established in the trial record. Trial counsel plainly failed to object on

-13-

inconsistency grounds to charging the counts in the conjunctive. Sweet has not offered a reason, and we see none, suggesting that appellate counsel would have needed a new evidentiary hearing to develop this claim.") (citing *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997) (finding that the trial record provided a sufficient basis for the ineffective assistance claim on trial counsel's failure to object to a jury charge, and so C.P.L. § 440.10(2)(c) was an adequate and independent basis for denying such a claim); *Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) (holding that C.P.L. § 440.10(2)(c) barred collateral attack on trial counsel for failing to object on double jeopardy grounds; defendant unjustifiably failed to raise the ineffective assistance issue on direct appeal). Accordingly, the trial court was correct in concluding that Powers unjustifiably failed to argue this ineffective assistance claim on direct appeal despite a sufficient record, and consequently waived the claim under C.P.L. § 440.10(2)(c). Accordingly, this claim is procedurally defaulted for the purposes of federal habeas review.

### 3.     Relief from Procedural Default

A procedural default will "bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Harris v. Reed*, 489 U.S. at 262 (citations omitted); *accord Coleman*, 501 U.S. at 749-50; *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995).

Powers has not demonstrated "cause" that would excuse her failure to raise this issue in his direct appeal, nor has she shown "prejudice" attributable thereto. Furthermore, Powers has not made a showing of "actual innocence," which is necessary in order to establish that there

would be a "fundamental miscarriage of justice" if the Court fails to consider the merits of the claim. *See*, *e.g.*, *Calderon v. Thompson*, 523 U.S. 538, 559 (1998); *accord Murray v. Carrier*, 477 U.S. 478, 496-97 (1986); *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002).

## Merits of the Petition

### 1.      Ineffective assistance of trial counsel

#### a.      Legal standard

To prevail on a claim that trial counsel rendered constitutionally ineffective assistance, a habeas petitioner must show that counsel's representation fell below "an objective standard of reasonableness" under "[p]revailing norms of practice" and "affirmatively prove prejudice" by showing that there is a "reasonable probability" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 693-94 (1984).  A petitioner must establish *both* that counsel's performance was deficient and that she was prejudiced as a result of counsel's errors in order to obtain relief on an ineffective assistance claim. *See id.* at 687.

#### b.      Alleged ineffectiveness

##### i.      Failure to have DNA testing performed

Powers complains that defense counsel "neglected to make any request to have the alleged victims [*sic*] body tested for the presence of the defendant [*sic*] DNA on the broken blade imbedded within the body or in any of the wounds of the victim." Petition at 5 (Docket No. 1). According to Powers, the defense left unanswered the question, "Was the weapon used to kill the victim, also the weapon used by the victim to attack the defendant, which supports the defendants [*sic*] self defense theory?" *Id.* at 6 (Docket No. 1). Powers reasons that if her DNA

-15-

were present in the deceased's body or on the knife blade, it would prove that her version of

events is "correct and that the prosecution erred resulting in the conviction of an actually

innocent defendant." *Id.*

The Court notes that the prosecution did not prove which knife was used to inflict

Powers' own wounds. However, as respondent points out, the prosecution's failure to produce

the knife is "hardly noteworthy," especially since, by her own testimony, Powers left Jarmack's

house with at least one knife and had the opportunity to discard it and other evidence in the

substantial amount of time that elapsed between when she left Jarmack's house and when her

parents called 911. On a more fundamental level, Powers' logic is flawed–even if scientific

testing had uncovered the presence of Powers' DNA in the victim's body or on the knife

embedded in his chest, this would not require the jury to accept petitioner's testimony that she

was acting in self-defense. Much more than that would be necessary for the jury to accept the

self-defense theory. For instance, the jury would have had to accept Powers' story that the victim

happened to show up (without his car) at the Ames plaza at the same time that Powers was there

and that he knew that Powers was going to be driving her parents' car. The presence of Powers'

DNA in the victim's body would not negate the fact that the victim was stabbed *after* he was

dead. Nor would it diminish the discovery of DNA consistent with Powers' DNA on the plastic

goggles found in the discarded gym bag found on Route 400, which also contained the bayonet

sheath that housed the bayonet that had belonged to Powers' ex-husband and which was found

next to the victim's dead body. Moreover, there was ample opportunity for DNA from Powers'

skin or saliva, for example, to have transferred to the victim's body or to the knife found plunged

into his body. Indeed, it is entirely possible that Powers could have used a knife to inflict a

wound on the victim after she allegedly inflicted defensive wounds on herself since two of the wounds on the victim were inflicted after his death.  As respondent notes, Powers admitted that she handled several knives at the victim's house. She also described that she and the victim struggled closely, moving from room to room throughout his house. One must not overlook the fact that the victim was stabbed a total of twenty-seven times. Thus, one might even reasonably expect, under these circumstances, to find Powers' DNA on the victim's body or on the knife.

In view of the record evidence, there is no reasonable probability that the jury would have returned a favorable verdict had defense counsel introduced the DNA evidence that Powers claims existed. Powers therefore cannot demonstrate that she was prejudiced by counsel's failure to have DNA testing performed. Because Powers is unable to demonstrate prejudice, there is no need to consider the performance prong of the *Strickland* test. *Strickland*, 466 U.S. at 697.

### ii.      Failure to investigate and to call witnesses

Powers contends that trial counsel was ineffective in failing to investigate and to call witnesses who would have undermined the veracity of prosecution witness Tascarella, the jailhouse informant. Powers does not identify which witnesses should have been contacted and interviewed, much less how any of these unidentified individuals would have revealed exculpatory or impeachment information or have been otherwise helpful to her case. "Such undetailed and unsubstantiated assertions that counsel failed to conduct a proper investigation have consistently been held insufficient to satisfy either *Strickland* prong." *Polanco v. United States*, Nos. 99 Civ. 5739(CSH), 94 CR. 453(CSH), 2000 WL 1072303, at *10 (S.D.N.Y. Aug. 3, 2000) (citing, *inter alia*, *Matura v. United States*, 875 F. Supp. 235, 237 (S.D.N.Y. 1995) ("Petitioner's bald assertion that counsel should have conducted a more thorough pretrial

investigation fails to overcome the presumption that counsel acted reasonably."); *Lamberti v. United States*, No. 95 Civ. 1557, 1998 WL 118172,2 (S.D.N.Y. Mar. 13, 1998) (rejecting Sixth Amendment claim based on failure to investigate or communicate with petitioner as "vague and conclusory. [The allegations] do not identify counsel's asserted failings with any specificity or show how any different conduct might have changed the result. Such allegations cannot sustain a petition for habeas corpus."); *United States v. Vargas*, 871 F. Supp. 623, 624 (S.D.N.Y. 1994) (rejecting ineffective assistance claim based on failure to investigate and failure to call character witnesses where there was "no evidence that avenues suggested by the client which might have altered the outcome were ignored" and petitioner "fail[ed] to identify what persuasive character witnesses would have been involved, or to show that counsel was unwise in not opening up such witnesses to cross-examination"); *Madarikan v. United States*, No. 95 Civ.2052, 1997 WL 597085, at *1 (E.D.N.Y. Sept. 24, 1997) (denying ineffective assistance claim based on failure to investigate or interview witnesses where petitioner's allegations of ineffective assistance were "conclusory, and g[a]ve no indication as to what exculpatory evidence may have been revealed by an investigation"); *United States v. Schaflander*, 743 F.2d 714, 721 (9th Cir. 1984) (denying as merely "conclusory" ineffective assistance claim based on counsel's failure to interview witnesses where the claim was unsupported by affidavits or statements from any witness or counsel)). This claim of ineffective assistance is simply too vague and conclusory to state a proper ground for habeas relief and, as such, must be dismissed.

## 2.    Claims relating to the testimony of the jailhouse informant

The bulk of Powers' petition is a critique of the prosecutorial use of jailhouse informants at criminal trials; defense counsel contends that, in the Erie County District Attorney's Office in

particular, there is a "pervasive" due process violation stemming from the use of jailhouse informants. Powers also argues that a criminal conviction based in part on the testimony of a jailhouse informant is unconstitutional if it follows a trial at which the jury is not issued an instruction to the effect that a jailhouse informant's testimony should be viewed with skepticism.

In denying these claims when raised in support of Powers' motion to vacate the judgment, the trial court observed that although she made some "interesting observations regarding the pitfalls inherent in prosecutorial reliance upon jailhouse informants, the fact remains that she has failed to demonstrate that the Erie County District Attorney acted improperly in the prosecution of this indictment." County Court Order Denying C.P.L. § 440.10 Motion at 3. The trial court stated that Powers' concerns about the ways in which juries should be instructed in cases where jailhouse informants provide testimony "should be directed to the legislature." *Id.*

The Court agrees with the trial court's assessment of the claims surrounding the testimony offered by Tascarella, the inmate with whom Powers discussed Jarmack's murder. Notably, the petition is devoid of any allegation or intimation that Tascarella, in fact, testified falsely, or that the prosecutor in Powers' case had any reason to believe that Tascarella offered false testimony.[14] As Powers has not alleged a specific error committed by the prosecutor in *her*

---

[14]     The Court notes the defense counsel aggressively cross-examined Tascarella about her fairly extensive criminal history, including prior convictions in which she was an accomplice, with her husband, in forging checks and stealing merchandise. *E.g.*, T.1502-08, T.1513-14. She admitted that at one time she had a six-hundred-dollar-a-day drug habit. T.1537. Tascarella explained she had been informant for the FBI a number of years prior to Powers' trial. T.1508. Tascarella ended up in the Erie County Holding Center in 1998 after being convicted in Genesee County for petit larceny following a guilty plea. She also had violated the terms of her probation from a conviction in Erie County and potentially was facing a one-year term of imprisonment for that. T.1526, 1534. However, Tascarella insisted that there were "no deals discussed" with the district attorney's office regarding the information concerning Powers. T.1534. Tascarella testified that at the time she informed the district attorney's office of Powers' confession, she knew that the town court judge was going to reinstate her probation and not require her to serve jail time. T.1534, 1535. Defense counsel pointedly cross-examined her about this, asking whether it was

*case*, this claim is wholly speculative and must be dismissed. Moreover, federal habeas review is not the proper forum in which to debate the issues raised by Powers concerning the use of jailhouse confessions to support criminal convictions, and that claim must be dismissed as well.

**CONCLUSION**

For the reasons stated above, Nancy Powers' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because she has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:       November 2, 2006
             Buffalo, New York.

---

just "another one of [her] stories." T.1535. Tascarella explained that while she was at the Erie County Holding Center, she was serving a one-year sentence and that she was released twelve weeks early to testify at Powers' trial, but that she "could go back to jail and finish off [her] time." T.1536. She denied defense counsel's assertion that the Genesee County case was "going to disappear[.]" T.1536-37. In sum, defense counsel utilized the substantial impeachment material provided by Tascarella's own criminal history in an attempt to discredit her testimony.